NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | | |
|---|---|---|
| _____ : | | |
| LUZ SEMIDEY, | : | |
| | : | |
| Plaintiff, | : | Civil No. 07-3872 (RBK) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |
| _____: | | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon appeal by Plaintiff Luz Semidey ("Semidey" or "Claimant"), pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits. For the reasons set forth below, the Court affirms the ALJ's decision.

**I.     BACKGROUND**

Claimant Luz Semidey alleges that she is disabled with an onset date of October 19, 2000. (R. at 29.) She claims that her disability arises from fibromyalgia, a chronic condition causing severe physical and mental impairments[1]. (R. at 15.) Her alleged symptoms include

_____

[1]The Third Circuit has accepted the following definition of fibromyalgia: "a common and chronic disorder characterized by widespread muscle pain, fatigue, and multiple tender points [which are] specific places on the body-on the neck, shoulders, back, hips, and upper and lower extremities-where people with fibromyalgia feel pain in response to slight pressure." Propopick v. Comm'r of Soc. Sec., 272 F. App'x 196, 197 (3d Cir. 2008.)

fatigue, insomnia, an inability to focus, irritable bowel syndrome, constipation, and a constant pain throughout her body including in her lower back, feet, knees, forearms, and elbows.

Claimant Semidey was born on February 14, 1959.  (R. at 389.)  She has a ninth grade education and no special training or certificates.  (R. at 352.)  Semidey received on the job training when she worked as an electrical inspector.  (R. at 352.)  She also has worked cleaning homes.  (R. at 390.)  She has not worked since the end of 2001, when her symptoms allegedly became too severe to continue working.  (R. at 349.)

Semidey has been treated by many different doctors since 1996, when her symptoms began.  Dr. Steven A. Litz met with the claimant on two occasions in 2001.  (R. at 225.)  Dr. Litz diagnosed Semidey with diopathic urticaria/angioedema, which is a rapid swelling or aggravation of the skin.  (R. at 230.)  Multiple lab tests were performed, and all results were normal.  Dr. Litz noted that Semidey was not always compliant with taking her medications.  Dr. Litz recommended she seek a second opinion with Dr. Arnold Levinson at the University of Pennsylvania, but the record does not reflect if Semidey ever did so.  (R. at 226, 231.)

Dr. Jack DiMarco examined Semidey on April 22, 2002 for a consultative examination at the request of the Social Security Administration.  (R. at 242.)  He found positive straight leg raising on the right, as well as discomfort in the heels and knees when attempting to heel walk.  (R. at 242.)  He found Semidey had some limitations, including decreased bilateral grip strength, difficulty doing any heavy lifting or carrying, and problems with standing and ambulation.  (R. at 242.)  Dr. DiMarco also indicated interruptions might be required for Claimant to be able to stand or walk for a prolonged period of time.  (R. at 242.)  Additionally, Dr. DiMarco felt that Semidey was incapable of performing high level physical activities such as climbing, balancing,

2

and crawling.  (R. at 243.)  He also found that her intermittent joint pain and episodes of joint

swelling to be suggestive of fibromyalgia or an inflammatory type arthritis.  (R. at 242.)

On January 22, 2002 the claimant also saw a rheumatoligist, Dr. Raymond A. Adellizi

who diagnosed her with migratory arthritis.  (R. at 261.)  The claimant saw Dr. Adellizi once

again on February 28, 2002, during which the doctor noted pain of an uncertain etiology when

Claimant moved her right knee.  (R. at 260.)  On March 21, 2002, the claimant was seen a third

time by Dr. Adelizzi who noted questionable swelling of the left knee as well as mild swelling of

the left subtalar (foot) joint with mild warmth.  (R. at 256.)  Dr. Adellizi prescribed Plaquenil for

her joints and continued the claimant's prescription for Voltaren, a non-steroidal anti-

inflammatory medication.  (R. at 257.)

Dr. Alexander Uy evaluated the claimant on April 23, 2002 for a consultative

examination at the request of the Social Security Administration.  (R. at 250).  Dr. Uy noted that

there were few objective findings and ultimately concluded that Semidey had a chronic history of

generalized musculoskeletal aches and pain with multiple trigger points.  (R. at 249-50.)  Dr. Uy

also indicated that Semidey might have underlying depression and fibromyalgia.  (R. at 250.)

On April 29, 2002 Semidey was evaluated for her joint pain by Mark Fisher, M.D.  (R. at

265.)  Dr. Fisher assessed the claimant as having demonstrable palindromic rheumatism

characterized by intermittent episodes of acute synovitis.  (R. at 265-266.)

On November 26, 2002, Dr. Linda Brecher, a rheumatologist, examined the claimant for

the first time and determined that she suffered from the signs and symptoms of fibromyalgia, as

well as a component of post-traumatic stress disorder due to a childhood episode of family abuse.

(R. at 278.)  Following the physical examination, Dr. Brecher also diagnosed her with cervical

and thoracic myofascial pain syndrome and chondromalacia patella of the knees.  (R. at 278.)

Dr. Brecher saw the Claimant again on January 22, 2003, and noted retropatellar crepitus of the

knees as well as tenderness in the posterior cervical region corresponding to all the tender points

of fibromyalgia.  (R. at 276.)  Dr. Brecher also indicated Semidey suffered from sleep disorder

and depression.  (R. at 276.)

On June 23, 2003 and March 24, 2003 Dr. Brecher again indicated that Semidey had

diffuse palpable tenderness including all of the tender points consistent with fibromylagia.  (R. at

294.)   Dr. Brecher also advised Semidey to continue taking Celebrex and Trazadone, which she

said were helping her sleep and manage her pain and also suggested a trial of Neurotin to treat

the burning quality of the pain.  (R. at 294, 295.)  Dr. Brecher saw her once again on September

25, 2003 and continued the diagnosis of fibromyalgia following a physical examination that

again exhibited tender points.  (R. at 294.)

Dr. Wu examined the Claimant and completed a physical residual functional capacity

assessment on December 24, 2002.  (R. at 284-91.)  He found Semidey capable of lifting or

carrying objects weighing ten pounds occasionally and less than ten pounds frequently.  (R. at

285.)  He also indicated she could stand or walk for at least two hours in an eight-hour workday,

sit for about six hours in an eight-hour work day, and was not limited in her abilities to push or

pull.  He also found her incapable of climbing a ladder, rope, or scaffolds.  (R. at 286.)  Dr. Wu

found the severity of Semidey's symptoms of itching, swelling, hives, and joint pain to be

consistent with her impairments of idiopathic angioedema and intermittent arthralgia (or non-

inflammatory joint pain), and he found that these impairments caused the functional limitations

he noted.  (R. at 289.)

4

Dr. Jane Friehling also saw the claimant on two occasions beginning on September 9, 2003 when she performed a physical examination.  (R. at 297.)  Dr. Friehling diagnosed Semidey with irritable bowel syndrome and possible fibromyalgia, prescribed Miralax and Zelnorm, and scheduled her for a full colonscopy.  (R. at 297.)  Upon reevaluation on March 30, 2004 the Zelnorm was noted to be helping the irritable bowel syndrome.  (R. at 297.)

Dr. Daniel Ragone treated the Claimant as a pain management specialist on numerous occasions beginning on March 19, 2004 and continuing until 2005.  (R. at 307.)  At the initial consultation Dr. Ragone conducted a physical examination and indicated that the claimant suffered from fibromyalgia, cervical and trapezius myofascial pain syndrome, chronic pain syndrome, and knee pain.  (R. at 307.)  Dr. Ragone saw Semidey on ten additional occasions between March of 2004 and December of 2005.  (R. at 308.)  On April 26, 2004, Dr. Ragone performed a physical examination and noted scattered trigger points throughout claimant's muscles.  (R. at 316, 318.)  On May 24, 2004, Dr. Ragone again noted diffuse scattered trigger points, as well as decreased abduction and flexion in both shoulders, positive piriformis test bilaterally, and crepitations in both knees.  He diagnosed Semidey with fibromyalgia, cervical trapezius, lumbar and piriformis myofascial pain syndrome, cephalgia, cognitive deficits, and chronic pain syndrome.  (R. at 317.)  In a report entitled "Fibromyalgia Residual Functional Capacity Questionnaire" prepared that same day, Dr. Ragone estimated that Claimant required more than four hours of cumulative resting during an eight-hour workday and that her pain and other symptoms would be severe enough to interfere with the attention and concentration needed to perform even simple work tasks on a frequent basis.  (R. at 302.)  On October 5, 2004, Dr. Ragone met with the claimant for a follow-up and again noted scattered trigger points, limited

range of motion in the shoulders, and tenderness in the forearms and legs.  He recommended neuropsychological testing for difficulties with attention and concentration.  (R. at 315.)

On May 21, 2001, Semidey filed an application for Disability Insurance Benefits.  The claim was denied initially, then again upon reconsideration, and once more in a hearing on September 22, 2004.  (R. at 15.)  On October 25, 2004 Semidey filed a request for review, and on May 9, 2005 the Appeals Council remanded the application for benefits to the Administrative Law Judge for additional consideration.  (R. at 15.)  On June 6, 2006, a subsequent hearing was held before Administrative Law Judge Christopher Bullard for review and decision.  (R. at 15.)

At the hearing, Semidey and her husband, William Barrett testified as to Semidey's impairments and limitations.  Semidey testified that she is always fatigued and suffers from achiness, headaches, stiffness in her joints, burning sensations in her arms, and sometimes swelling in her knees.  (R. at 397.)  She indicated that her condition had neither improved nor worsened in the last five years.  (R. at 397.)  She said that she spends most of her day resting in bed, constantly shifting.  (R. at 398-99.)  Once getting out of bed, she testified that it takes about an hour to loosen up and be able to walk around.  (R. at 398.)  She said that she cannot run the vacuum but can do light dusting or tidying around the home.  (R. at 398.)  She reads the paper or does puzzles to keep her mind active.  (R. at 399.)  She no longer drives, and her husband does the grocery shopping.  (R. at 400.)  She said that because she never knows how she will feel, she cannot make social plans or go out.  (R. at 402.)  She also said that her medications "take the edge away" but never "take the pain away."  (R. at 402.)

William Barrett testified that prior to Semidey's onset of fibromyalgia, they led a very active life.  (R. at 414-15.)  Since her symptoms began, he said she has been far more limited in

her activities.  He testified that he has been to many meetings with her doctors, whose ultimate "suggestion [was] to get on with life" because though they had prescribed many medications, none knew how to help Semidey.  (R. at 417-18, 420.)

The ALJ also took testimony from Dr. Brad Rothkopf, a specialist in internal medicine, geriatrics, and cardiology.  (R. at 426.)  Dr. Rothkopf was called as an impartial medical expert; he had not examined Semidey but had reviewed the medical evidence in the record.  (R. at 426-27.)  Dr. Rothkopf testified that Semidey did have most of the symptoms and signs of fibromyalgia, but he noted the record included virtually no objective findings "in the sense that they are independent of any commentary or explanation by Ms. Semidey."  (R. at 428.)  Dr. Rothkopf testified that he agreed with the diagnosis of fibromyalgia, which he said did not meet any listed impairment.  (R. at 429-30.)  Further, when asked by the ALJ if Semidey had any exertional limitations imposed by her fibromyalgia, Dr. Rothkopf testified that any limitations would be imposed by Semidey's pain and how she was feeling and not by any functional or anatomical issues.  (R. at 430.)  He testified that she should be able to perform whatever work she felt she could do without limitation.  (R. at 430-32.)

Vocational expert Mitchell Schmitt also testified at the hearing.  Schmitt testified that Semidey's work as an electrical inspector was classified as light-duty, semi-skilled work.  He classified her housecleaning as light-duty also.  (R. at 434.)  ALJ Bullard asked Schmitt to identify what sort of work an individual with the following limitations over an eight-hour workday could do: the individual could sit for a maximum of one hour at a time for a maximum of six hours in a day, could stand for a maximum of fifteen minutes at a time for a total of two hours in a day, could walk for fifteen minutes at a time for a total of one hour in a day, could lift

ten pounds occasionally and less than ten pounds frequently, could never climb ladders, kneel, or crawl and could occasionally climb stairs, stoop, or perform activities requiring balance.  (R. at 435-36.)  Schmitt indicated that with those limitations Semidey's past relevant work would be ruled out, but she could perform other sedentary unskilled work existing in significant numbers in the national economy, including working as an account clerk, addresser, or call-out operator. (R. at 436-37.)  He noted that if the individual needed to take frequent unscheduled breaks or could not maintain regular attendance, the individual could not perform any work.  (R. at 438.)

  Semidey has acquired sufficient quarters of coverage to remain insured only through December 31, 2003 and so was required to show that she was disabled of that date.  (R. at 15.) The Administrative Law Judge concluded that at the time her insured status expired the claimant was not disabled and could work in a number of sedentary positions which existed in significant numbers in the national economy.  (R. at 16.)  The claimant then appealed the ALJ's decision to this Court for review on January 31, 2008.

## II.    STANDARD OF REVIEW

District Court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)

(citing Hartranft, 181 F.3d 358, 360 (3d Cir. 1999)); see also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984) ("A district court may not weigh the evidence or substitute its conclusions for those of the fact-finder.").

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)) ("[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."). Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Secretary of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d 110, 114 (3d Cir. 1983)).

## III.   DISCUSSION

For disability insurance benefits, a claimant must meet the insured requirements of the

Social Security Act.  An impairment, even an impairment which rises to a disabling level, cannot be the basis for a determination of disability when the impairment arose or reached disabling status after the date last insured.  See DeNafo v. Finch, 436 F.2d 737, 739 (3d Cir. 1971).  The determination of disability before the date last insured must be demonstrated through medical evidence.  Id.; see also Manzo v. Sullivan, 784 F. Supp. 1152, 1156-57 (D.N.J. 1991).

The Commissioner conducts a five step inquiry to determine whether a claimant is disabled.  20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity."  Such activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and analyze whether the RFC would enable the claimant to return to her "past relevant work."  20 C.F.R. § 404.1520(e).  The ability to return to past relevant work precludes a finding of disability.  If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy."  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

Before applying the five-step process, the ALJ initially concluded that Semidey last met

the insured status requirements of the Social Security Act on December 31, 2003.  (R. at 15.)
The ALJ next concluded that Semidey had not engaged in substantial gainful activity at any time
since the alleged onset of disability on October 19, 2000.  (R. at 16.)  The Administrative Law
Judge next concluded that "the claimant failed to show that she had any severe impairment with
the exception of fibromyalgia, knee pain, chronic pain syndrome, post traumatic stress disorder,
and depression from the onset date to the last insured date."  (R. at 16.)  He then concluded that
during the period at issue, none of these impairments met or equaled any of the listed
impairments.  (R. at 17.)  The ALJ next determined that through October 19, 2000, Semidey did
not retain the residual functional capacity to return to her past relevant work as an electrical
inspector or as a house cleaner.  (R. at 29.)  The ALJ finally concluded that Semidey was capable
of making an occupational adjustment to work in a sedentary position with some additional
limitations, and based on the testimony of a vocational expert he determined that such positions
exist in significant numbers in the national economy.  (R. at 31.)

Semidey argues that the ALJ erred in four aspects of his decision.  Semidey first argues
that the ALJ erred by not giving any weight to the opinions of Dr. Ragone, her treating pain
management specialist.  She next argues that ALJ Bullard did not appropriately account for her
impairments in the formulation of her RFC.  (Pl. Br. at 17.)  Semidey next argues that the ALJ
erred in determining her credibility.  Finally, she contends that ALJ Bullard failed to properly
evaluate the impairment of fibromyalgia.

### A.     Opinion of Dr. Ragone

Claimant argues that ALJ Bullard improperly rejected the opinion of Dr. Ragone.  "A
cardinal principle guiding disability eligibility determinations is that the ALJ accord treating

physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Id. (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)). "In choosing to reject the treating physician's assessment, an ALJ . . . may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." Id. (quoting Plummer, 186 F.3d at 429).

First, the Court notes that ALJ Bullard indicated that he was not entirely rejecting the opinion of Dr. Ragone. Instead, he rejected Dr. Ragone's "opinion of the claimant's residual functional capacity and her ability to maintain a full-time position on or before the date she was last insured." (R. at 26.) This was entirely proper, as decisions such as whether a claimant is able to work or not are to be made by the Commissioner. 20 C.F.R. § 404.1527(e)(1) & (3).

ALJ Bullard noted that Dr. Ragone first saw Semidey after December 31, 2003, when her coverage for disability insurance benefits expired. Dr. Ragone saw Semidey first on March 19, 2004. At this evaluation, he noted scattered trigger points but normal muscle tone, intact balance, and some limitations in range of motion in her joints, particularly in her back. He indicated that she had fibromyalgia and pain syndromes. (R. at 304-05.) Three visits later, he completed a Residual Functional Capacity report describing Semidey's pain and fatigue. (R. at 299.)

In this assessment, Dr. Ragone indicated that Semidey suffered from tender points, pain, chronic fatigue, muscle weakness, swelling, headaches, numbness, and anxiety. (R. at 298.) He further indicated that her pain and fatigue were such as to prevent her from performaing normal work activities more than three to four days per month. (R. at 299.) When asked about clinical

findings and objective signs, he noted "weakness in muscles." (R. at 300.) He also noted that Semidey would require multiple rest periods throughout the day, adding up to more than four hours needed to be spent in a supine position. (R. at 301-02.) Dr. Ragone said that this condition had existed before 2000, and in fact since 1991. (R. at 303).

There are inconsistencies, which ALJ Bullard noted, between this assessment and other medical evidence, including Dr. Ragone's own conclusion that while Claimant had pain she had normal muscle tone and Dr. Brecher's conclusion that Claimant had pain but no evidence of joint swelling other than her right knee. (R. at 305, 278.) The opinion of Dr. DiMarco in April 2002 further undermines Dr. Ragone's assessment, as Dr. DiMarco found some bilateral strength decrease but otherwise good strength in her hands, hips, knees, and ankles. (R. at 242.) There is simply no medical evidence to support limitations to the extent Dr. Ragone indicated were necessary in this assessment, as the ALJ noted. (R. at 26.) Claimant's assertion that the ALJ "misconstrued the medical evidence" is itself error. (Pl.'s Br. at 27.)

ALJ Bullard thoroughly reviewed the medical evidence in his opinion. Additionally, he noted that Dr. Ragone prepared this assessment after the expiration of Claimant's disability insurance coverage and after seeing Semidey only three times. Given the inconsistencies between Dr. Ragone's assessment and the totality of the medical evidence, ALJ Bullard properly discounted this report. The ALJ's conclusion on this point is supported by substantial evidence.

### B.  RFC Determination

Claimant contends that the ALJ erred when in finding that Semidey had severe impairments but failing to appropriately account for those impairments in the formulation of her RFC. She also argues that the ALJ failed to consider her non-exertional limitations. The Court

finds that the ALJ's determination on this issue is supported by substantial evidence.

Claimant focuses on her complaints of pain and mental limitations. A claimant's subjective complaints of pain must be considered but will not themselves constitute disability in the absence of objective medical evidence. A claimant "must show that he has a condition which reasonably could be expected to produce the alleged symptoms that are the cause of his inability to work." Williams, 970 F.2d at 1186. When determining an RFC, the ALJ "must consider the combined effect of multiple impairments, regardless of their severity." Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000); 20 C.F.R. § 404.1523. However, in order for the ALJ to find that severe impairments impact a claimant's RFC, there must be evidence that these conditions actually imposed some limitations. Hartranft, 181 F.3d 359. The burden of providing such evidence rests on the claimant. 20 C.F.R. § 404.1545 (a)(3).

ALJ Bullard did conclude that Semidey had fibromyalgia, which could be reasonably expected to produce her symptoms, and he did take Semidey's resulting severe impairments into account. Because of her pain and difficulty standing, walking, or sitting for lengthy periods of time, ALJ Bullard appropriately limited her RFC by concluding that she could only stand for fifteen minutes continuously, walk for fifteen minutes continuously, or sit for fifteen minutes continuously. (R. at 22.) He further noted that she could lift ten pounds only occasionally. The medical evidence supports these limitations–there is evidence that Semidey suffers from diffuse tender points, pain, stiffness in the joints, and fatigue. The ALJ discussed this evidence at length, focusing on the evidence from before December 31, 2003, which is when Claimant was last insured for disability insurance benefits. (R. at 23-25.) Semidey correctly points to her consistency in reporting her pain to her doctors; however, the record does not include many

14

exertional or non-exertional limitations those doctors recommended as a result.  As the ALJ noted, Dr. DiMarco indicated that Semidey "may have limitations with regard to standing and ambulation" and "may require interruptions if it is necessary for her to stand or walk for a prolonged period of time."  (R. at 242.)  ALJ Bullard included these limitations in his calculation of Semidey's RFC.  Furthermore, to the extent that Dr. Ragone indicated in his 2004 assessment that Claimant had other limitations as a result of her pain, the ALJ properly discounted that opinion, as discussed above.  The ALJ's conclusion regarding limitations resulting from her pain is supported by substantial evidence.

Claimant also argues that ALJ Bullard erred in not considering any non-exertional mental limitations.  She asserts that ALJ found that moderate limitations in social functioning and in concentration, persistence, and pace and mild limitations in activities of daily living but failed to include those limitations in her RFC.  While ALJ Bullard did not limit Claimant's RFC to unskilled work, the question he posed to the Vocational Expert Schmitt at the hearing did include limitations on the mental demands of the work.  He asked Schmitt about jobs that were "simple, repetitive tasks requiring simple instructions."  (R. at 438.)  The jobs Schmitt identified all fit within these parameters.  (R. at 438.)  The Court further notes that the record contains only Claimant's statements as to her mental limitations; the only objective medical evidence regarding any mental impairments are Claimant's various diagnoses of depression and accompanying prescriptions for anti-depressant medications.  (E.g., R. at 277-79.)  Claimant was referred by Dr. Brecher to a mental health counselor in November 2002 and met with a counselor at least a few times, but discontinued this treatment, and there is no medical evidence regarding mental health treatment.  (R. at 423-24.)  While Dr. Ragone did indicate that Semidey should seek

15

neuropsychological testing for her concentration problems, that occurred in November 2004, after her insurance coverage expired.  See DeNafo, 436 F.2d at 739.  While Semidey was prescribed anti-depressant medications on numerous occasions, no doctor opined that this depression caused any resulting limitations on her abilities.

Claimant's difficulties in maintaining pace and persistence during work were accounted for in the ALJ's conclusions, and the way the ALJ incorporated those difficulties into his determination as to Semidey's RFC is supported by substantial evidence.

### C.     Claimant's Credibility and the Nature of Fibromyalgia

Claimant argues that the ALJ erred in determining her credibility.  This argument is entwined with her argument regarding the ALJ's misunderstanding of the impairment of fibromyalgia.  Semidey argues that the ALJ's "focus on a lack of objective diagnostic tests" improperly took her clinical signs and symptoms into account.  Semidey argues that because ALJ Bullard did not understand fibromyalgia, he improperly found her not credible.

The Court finds that ALJ Bullard's treatment of Semidey's fibromyalgia and its accompanying limitations is supported by substantial evidence.  ALJ Bullard concluded that Semidey suffers from fibromyalgia, and he found it to be a medically determinable severe impairment.  Further, he found that the fibromyalgia resulted in functional limitations, including limitations on Semidey's abilities to sit, stand, or walk for lengthy periods of time and limitations on her abilities to lift or do complicated tasks.

Semidey's challenge to ALJ Bullard's discussion of her impairments revolves around the way he took into account her pain.  An ALJ should consider a claimant's subjective complaints of pain even if not fully confirmed by the objective medical evidence.  Smith v. Califano, 637 F.2d

968, 972 (3d Cir. 1981); <u>Bittel v. Richardson</u>, 441 F.2d 1193, 1195 (3d Cir. 1971).  Semidey

alleges that she has "severe and debilitating fibromyalgia."  ALJ Bullard did not disagree with

the severity of her fibromyalgia.  However, in order to determine whether the limitations

resulting from that impairment are so severe as to result in a finding of disability, it is necessary

to determine what limitations result from the impairment.  ALJ Bullard reviewed Claimant's

limitations as she alleged them to be, and he reviewed the limitations noted by her doctors.  The

ALJ ultimately concluded that Semidey had diffuse pain, symptoms, and limitations, but not to

the extent she alleged.

      In forming this conclusion, the ALJ pointed to several inconsistencies in the record.  The

Court agrees with Claimant that the testimony regarding her ability to drive was not necessarily

inconsistent, as the record does reflect Claimant's increasing reluctance over time to drive.

However, the ALJ additionally based his conclusions on other inconsistencies between

Claimant's statements on pain reports submitted to the Social Security Administration and

reports from her treating physicians, including Drs. Litz, DiMarco, and Brecher.  (R. at 28.)  The

Court agrees that these inconsistencies in Semidey's reports of her condition, regarding some of

her reports of swelling in 2001, for example, diminish her credibility.  Furthermore, as discussed

above, though all of Semidey's doctors documented her reports of pain, none indicated that she

was severely functionally limited as a result (with the exception of Dr. Ragone, whose opinion

the ALJ properly rejected).

      For example, Dr. Litz recommended a maintenance low-dose steroid to combat the

swelling, though Semidey preferred to avoid steroids.  (R. at 222-26.)  Dr. Uy noted that

Claimant had multiple trigger points but otherwise noted "very few objective physical findings"

during his evaluation and recommended psychiatric consultation for depression.  (R. at 250.)  Dr. Fisher advised continuing with anti-inflammatory medications on a routine basis.  (R. at 265-66.) Dr. Brecher recommended structured sleep habits, physical therapy, and pain and anti-inflammatory medications.  (R. at 279, 295, 296.)  Dr. DiMarco advised that she had limitations standing, walking, or sitting for lengthy periods of time.  (R. at 242-43.)  Dr. Wu recommended the same limitations as Dr. DiMarco.  (R. at 284-90.)  No other limitations were indicated, and the ALJ adopted the doctors' conclusions regarding Semidey's functional limitations.

ALJ Bullard did not "wholly disregard" the testimony of Claimant or of her husband. Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  However, he determined that their assertions concerning the severity of Semidey's symptoms were only credible "to the extent that they support a finding of being able to perform sedentary work with the cited preclusions during the period at issue."  (R. at 29.)  He did seriously consider her pain, and he took that pain into account in forming his conclusions.  See, e.g., Prokopick v. Comm'r of Soc. Sec., 272 F. App'x 196, 199 (3d Cir. 2008) (finding ALJ properly evaluated credibility of claimant with fibromyalgia where he considered subjective complaints of pain together with the entire record and ultimately concurred with impartial medical expert that condition did not preclude sedentary work).  The ALJ properly evaluated Claimant's credibility in forming his conclusions as to her limitations.

## IV.    CONCLUSION

ALJ Bullard's decision is supported by substantial evidence in the record.  This Court affirms his decision that Semidey is not entitled to disability insurance benefits.  An accompanying order will issue today.

18

Dated:    8/29/08                                   /s/ Robert B. Kugler
                                              ROBERT B. KUGLER
                                              United States District Judge